United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAVE STRAWBERRY CANYON, a non-profit corporation,

    Plaintiff,

  v.

DEPARTMENT OF ENERGY, et al.,

    Defendants.

   /

No. C 08-03494 WHA

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

Plaintiff Save Strawberry Canyon brought this environmental action under the National Environmental Policy Act to challenge a large development project planned by the University of California and the Lawrence Berkeley National Laboratory. The complaint seeks a declaration that the project is a "major federal action" governed by NEPA and injunctive relief halting the project until defendants complete the environmental impact review required by NEPA. Plaintiff now moves for a preliminary injunction.

For the reasons stated below, this order finds that plaintiff has raised "serious questions" going to the merits of its claim that the project is a major federal action. Moreover, irreparable injury from the alleged NEPA violation is imminent inasmuch as the project is soon to break ground. A limited preliminary injunction will therefore issue to remain effective until the full merits can be resolved later this year.

**STATEMENT**

Plaintiff Save Strawberry Canyon is a local citizens' group based in Berkeley. Its mission is to preserve and protect the watershed lands and cultural landscape of Strawberry Canyon, which is located in the hills above the city of Berkeley. It pursues this mission by informing the public about the impacts of proposed developments, encouraging location of such developments to more suitable sites and promoting better public access to the canyon. Plaintiff brought this lawsuit seeking (i) a declaration that defendants' Computational Research and Theory Facility project is a "federal action" governed by NEPA and (ii) a preliminary and permanent injunction halting the development and construction of the project until NIPA compliance is achieved — in particular, the preparation of an environmental impact statement and public comment.

Defendants include the Department of Energy; the Secretary of Energy; the interim director of the Lawrence Berkeley National Laboratory ("LBNL"); and each of the members of the Regents of the University of California.

LBNL is a national laboratory operated for the benefit of the United States Department of Energy. It is overseen by DOE's Department of Science. LBNL conducts research across a wide range of scientific disciplines. Pursuant to a contract with DOE, it is operated and managed by the University of California. The DOE contract directs the contractor, *i.e.*, the university, to accomplish the missions and programs assigned by DOE and ties LBNL's budget and program planning to those of DOE, *inter alia*, through performance-based contract approaches (*see* Lozeau Exh. A, A1).[1]

The Computational Research and Theory Facility ("CRT") is a project proposed, and to be constructed, by LBNL and the University of California. It is to include a large new building at LBNL to house the Department of Energy's National Energy Research Scientific Computing Center; the associated High Performance Computing Center; and researchers and students from LBNL's Computational Research Division as well as the joint UC Berkeley-LBNL

---

[1] *See also* http://labs.ucop.edu/labprimecontracts/ (last visited Mar. 11, 2009). This order takes judicial notice of these and other below-described documents.

2

1  Computational Science and Engineering Program.  It is also to include associated access
2  driveways and other infrastructure.  The building will be approximately 126,300 square feet in
3  size and will be located in the western portion of the LBNL complex adjacent to Building 50,
4  off of Cyclotron Road in Berkeley.  It is to be owned by the Regents and constructed on
5  Regents-owned land but is to be utilized by LBNL, as recognized in the 2006 Long Range
6  Development Plan (Def. Req. Not. Exh. 4, 5; Lozeau Exh. B, D, K, M, N).  Plaintiff claims that
7  the project would damage the environment in or around the canyon (which as stated is located
8  in the hills adjacent to LBNL and the Berkeley campus) and would harm its members'
9  recreational and aesthetic enjoyment of the area.

10  A key purpose of the facility was to house DOE's Computational Research and Theory
11  Facility, a series of large, high-performance computers which are currently housed in a leased
12  facility in Oakland.  The project was designed in part to accommodate the needs of the
13  supercomputers, including cooling systems, air intakes and additional electrical power
14  capabilities (Lozeau Exh. B–D; Lozeau Exh. I at 24).

15  Construction of the project is projected to cost approximately $13 million.  Of that
16  total, $107 million will be obtained from external financing which in turn will be repaid from
17  LBNL operating funds if the federal government ultimately utilizes the facility.  LBNL
18  receives revenue from three primary sources:  (1) Department of Energy (approximately 77
19  percent); (2) National Institutes of Health contracts and grants (approximately eight percent);
20  and (3) other agencies' contracts and grants (approximately fifteen percent).  The university
21  understood that DOE will be supportive of the effort by agreeing to increase LBNL funding for
22  the  financing costs commencing in fiscal year 2011 (Def. Req. Not. 6–10; Lozeau Decl. Exh.
23  C, E).

24  Defendants have taken no steps to comply with NEPA's requirements because, they
25  maintain, they were not (and are not) required to do so.  Defendants have been on notice at
26  least since January 2008 of plaintiff's contention that the project is governed by NEPA.
27  Plaintiff sent a letter to LBNL's Environmental Planning Group Coordinator dated January 4,
28  2008, expressing the view that the project is a federal action and therefore subject to NEPA.

3

LBNL responded to plaintiff's letter and stated that the project "is not subject to NEPA review" (Lozeau Exh. D at 4.0-80, 4.0-105). LBNL and the university did, however, prepare an environmental impact report pursuant to the California Environmental Quality Act. Cal. Pub. Resources Code §§ 21000 *et seq*.

From the record as well as the parties' representations at the hearing, it is evident that project planning is at an advanced stage and construction of the project will begin in the near future, including the removal of trees and grading activities. Plaintiff filed suit in July 2008 alleging that defendants' initiation of the project will irreparably harm the environment, including via air pollution, aesthetic, cultural, noise and other environmental impacts which will impact plaintiff and its members. Plaintiff also claims procedural injury. The complaint asserts one claim for relief: a claim under the National Environmental Policy Act for a declaration that defendants are in violation of the Act and an injunction prohibiting defendants from initiating the project until and unless defendants comply with NEPA, including by preparing and considering an environmental impact statement and public comment. Plaintiff now moves for a preliminary injunction.

**ANALYSIS**

"In brief, the bases for injunctive relief are irreparable injury and inadequacy of legal remedies. In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). The Supreme Court recently clarified that, even where a likelihood of success on the merits is established, a mere "possibility" of irreparable injury will not suffice; rather, irreparable injury must be "likely." *Winter v. Natural Resources Defense Council*, 129 S.Ct. 365, 374–76 (2008). Injunctive relief has been found appropriate where a plaintiff shows likely irreparable injury and "that serious

4

questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor." *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008).[2]

The University of California defendants and the federal defendants separately oppose the motion. Defendants do not dispute that they have yet to complete a federal EIS (although they did prepare an environmental impact report under California law). Both the UC defendants and the federal defendants contend, however, that they were are not required to do so because the project is not a "major *federal* action" and therefore is not governed by NEPA. The UC defendants further urge that the balance of equities and public interest weigh against injunctive relief.

### 1. A FEDERAL ACTION?

NEPA requires federal agencies to prepare "a detailed statement by the responsible official on . . . the environmental impact of the proposed action [and other matters]" for "every recommendation or report on proposals for legislation and *other major Federal actions significantly affecting the quality of the human environment*." 42 U.S.C. 4332(2)(C) (emphasis added). This "detailed statement" is often referred to as an environmental impact statement ("EIS"). As Section 4332(2)(C) clearly suggests, however, "[t]o trigger the application of NEPA, an action must be 'federal.'" *Rattlesnake Coalition v. Environmental Protection Agency*, 509 F.3d 1095, 1101 (9th Cir. 2007). When agencies do not know whether the effects of an action will be "significant" they are directed to prepare a shorter environmental assessment ("EA") to help make that determination. 40 C.F.R. 1501.4(b).

The term "major federal actions" is defined by regulation:

> Major Federal action includes actions with effects that may be major and which are potentially subject to *Federal control and responsibility* . . . .

---

[2] The Ninth Circuit had, just months before *Winter*, articulated its traditional test as follows: "A preliminary injunction is appropriate when a plaintiff demonstrates either: (1) a likelihood of success on the merits and the *possibility* of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor . . . ." *The Lands Council*, 537 F.3d at 987 (emphasis added). In *Winter* the Supreme Court rejected the first prong but did not address the second. The second prong is relevant where irreparable injury is likely and imminent — for example, in the case of imminent foreclosure or deportation — and the plaintiff has demonstrated a serious merits issue but may be unable to demonstrate a *likelihood* of success on the merits, for example, because it has not yet had the benefit of discovery. *Winter* does not foreclose injunctive relief in such situations.

5

> (a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies . . . . Actions do not include funding assistance solely in the form of general revenue sharing funds . . . . with no Federal agency control over the subsequent use of such funds . . . .
> (b) Federal actions tend to fall within one of the following categories: [four categories, including]
>
> \*   \*   \*
>
> (3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.
> (4) Approval of specific projects, such as construction or management activities located in a defined geographic area . . . . [including] federal and federally assisted activities.

40 C.F.R. 1508.18 (emphasis added). The regulations also define when an action reaches the "proposal" stage. 40 C.F.R. 1502.5, 1508.23.

As the Ninth Circuit has explained,

> [t]here are no clear standards for defining the point at which federal participation transforms a state or local project into a major federal action . . . . The matter is simply one of degree . . . . "Marginal" federal action will not render otherwise local action federal. To make this determination, [courts] look to the nature of the federal funds used and the extent of federal involvement . . . . While "significant federal funding" can turn "what would otherwise be" a state or local project into a "major federal action," consideration must be given to a "great disparity in the expenditures forecast for the state [and county] and federal portions of the entire program."

*Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 959–60 (9th Cir. 2002) (citations omitted). Moreover, "a local plan does not become a major federal action subject to NEPA regulations merely upon its approval by a federal agency . . . . The United States must maintain decision-making authority over the local plan in order for it to become a major federal action." *Rattlesnake Coalition*, 509 F.3d. at 1102 (citations omitted). This is because "[t]he purpose of NEPA is to bring environmental considerations to the attention of federal decision-makers. This pre-supposes that [the federal agency] has judgment to exercise." *Ka Makani 'O Kohala Ohana*, 295 F.3d at 960—61. *See also* 40 C.F.R. 1500.1(c).

In sum, courts look to the degree of federal funding and to indicia of federal involvement and control.

6

### A.     Indicia of Control.

Plaintiff asserts that the project is a "federal" action because it was proposed by the LBNL which, plaintiff argues, is a federal entity affiliated with DOE, as well as by the university (a state entity). Moreover, even if the proposal is from a purely state entity, plaintiff argues, the proposal is deemed federal where a national agency plays a significant role in the project.

On the one hand, plaintiff presents substantial evidence that LBNL, for its part, is a federal entity or that DOE funds and maintains a significant degree of control over it and its operations. Plaintiff also provides evidence that DOE has had interest in, and involvement with, the project. On the other hand, the *state* university operates LBNL. The university has its own non-federal reasons for promoting the project. At this preliminary stage, the record does not establish which entity really directed and controlled the project.

LBNL relies predominantly if not exclusively on federal funding (Lozeau Exh. C at 12). It exists purely by virtue of its contract with DOE. LBNL can only act pursuant to and in accordance with the federal contract and, under the contract, its purpose is to advance DOE's objectives and mission (Lozeau Exh. A at C-1–C-7, C-14, H-2). It has a federal government website: www.lbl.gov. In fact, as plaintiff emphasizes, the environmental impact report prepared (by the university with participation by LBNL personnel, as explained below) to satisfy state law described NBNL as "a *federal* facility managed and operated by the University of California under a U.S. Department of Energy (DOE)-UC contract" (Lozeau Exh. B at 1.0-2, emphasis added). The report further emphasized that LBNL is distinct from the university: "LBNL is overall a Department of Energy Facility, which does not lend it to combining planning processes with UC Berkeley, which has no such DOE connection" (Lozeau Exh D. at 4-131; *see also* Lozeau Exh. K at 4). DOE must approve any work LBNL performs for non-DOE entities, including the Regents (Lozeau Exh. A at H-5–H-7).

Defendants reply that the LBNL is merely a collection of assets, not an independent entity capable of suing and being sued, and that LBNL personnel are employees of the Regents, not DOE. Those facts are relevant but not dispositive as to the extent of federal

government control over, or responsibility for, the project. Although the university of California operates LBNL, it does so pursuant to the terms of DOE contract, which circumscribes those operations and defines LBNL's the goals — goals which are enforced via the contract's performance-based criteria. As defendants themselves indicate, the university has the ability to charge costs to LBNL (and thus DOE) as opposed to its own budget (UC Def's at 13). As stated, project documents both refer to LBNL as an entity and emphasize its distinct nature from the university, and project documents refer to "LBNL staff."

A central point of dispute is whether the university or the LBNL and DOE were (and are) the driving force behind the project. As stated, plaintiffs contend that this is a LBNL and DOE-driven project, the primary purpose of which is to house DOE's supercomputers. In contrast, defendants argue that, although a possible use for the project — admittedly, a desired use — is to house DOE's supercomputers, the university is undertaking the project not at the direction of DOE but independently, of its own accord, in order to solidify its relationship with DOE and its status as the operator of the LBNL. Put differently, defendants contend that, although the facility is conceded aimed in part at maintaining and promoting the university's longstanding and mutually beneficial relationship with DOE, the university undertook the project independently, acting in its own self-interest in a "competitive environment," *i.e.*, in an effort to maintain the federal contract. They contend that DOE wielded no "actual power to control the CRT Facility Project directly" (UC Def. Opp. at 12).

On this important point, the record is incomplete and inconclusive but at a minimum plaintiffs have raised "serious questions going to the merits" of whether the project was subject to federal control or responsibility. The record indicates that the project was conceived for the benefit of the LBNL and DOE: a primary purpose of the project was to house DOE's "next generation" supercomputer systems — the National Energy Research Scientific Computing center and the associated High Performance Computing center — and in fact elements of the project architecture were designed with the unique needs of those systems in mind (*see, e.g.*, Lozeau Exh. B at 2.0-2; Lozeau Exh. C at 6; Exh D at 2.0-1; Exh. I at 24; Lozeau Exh. L at 3). The evidence also demonstrates that LBNL maintained a degree of input into, and potentially

8

United States District Court
For the Northern District of California

1    control over, the project. The LBNL contract is performance-based and therefore contingent
2    on the LBNL meeting DOE's needs. The contract expressly mandated that LBNL, in
3    partnership with DOE, "[r]enew and enhance research facilities and equipment so that the
4    Laboratory remains state-of-the-art over time and is well-positioned to meet future DOE
5    needs" (Lozeau Exh. A at C-4). LBNL 2007 Ten Year Site Plan emphasized DOE's role in the
6    project, explaining for example that LBNL will provide new facilities for DOE's
7    computational centers "[w]orking in close connection with [DOE's Office of Sciences]," and
8    that certain "preliminary approvals have been obtained, including a CD-0 for mission need and
9    a lease-occupancy program [that] have been approved by the [DOE's] Office of Sciences"
10   (Lozeau Exh. M at 13, 23, 61). In May 2008 DOE submitted a letter expressing support for
11   LBNL's and UC Berkeley's plans for the future of the agency's computation centers, quite
12   possibly a reference to the CRT project (Lozeau Exh. H). The fact that the project proposal
13   incorporates specific design features specifically to accommodate the needs of DOE's
14   computer centers — such as cooling towers and unique electricity needs — is also probative of
15   DOE involvement. Furthermore, while the University of California was named the "lead
16   agency" for the state environmental impact report, LBNL was given responsibility for the
17   project's environmental mitigation program, and LBNL staff had input into the project's
18   design in that capacity (Lozeau Exh. D at 2.0-1; Lozeau Exh. I at 1–2, 18, 24).

19   This evidence certainly indicates that the project was contemplated, in significant part,
20   for DOE use; that DOE had the *ability* to exert, at a minimum, substantial indirect influence
21   over the project (for example, via the performance-based LBNL contract); and that DOE did in
22   fact involve itself in the project in certain respects. Conceding that the record is inconclusive
23   regarding the precise nature of that influence and the extent to which it was exercised, this
24   order finds that plaintiff has created a substantial question regarding whether the federal
25   government exercised decision-making authority and control over the project.

26   **B.     Project Funding.**

27   The nature of the project's funding is hotly disputed. Plaintiff contends that the federal
28   government is highly likely to relocate its supercomputers to the site and that, and when it

9

does, it will provide the bulk of the financing for the project through LBNL (and DOE's funding therefor). Defendants contend, in contrast, that the CRT project will not be federally owned and there exists no *commitment* to relocate DOE's next-generation computer systems to the site nor any federal financing or lease commitment for the project. Defendants argue that — although the university admittedly hopes DOE will use the facility — "NERSC's relocation is not part of the CRT Facility Project and is not necessary for the project to move forward" (UC Def's Opp. at 5, 14–15).

As defendants contend, the current record suggests that the federal government has no *commitment* in place to fund the project. Indeed, the national government has taken a degree of care to disclaim any financial commitment therefor. The record also indicates, however, that DOE use of the facility for its supercomputers remains a likely possibility, and if DOE *does* ultimately use the facility it will fund the vast majority of the project's financing costs.

A March 2008 "Memorandum of Understanding" between DOE and the Regents explained that the project "will be constructed at the University's own expense" and that "there is no agreement with DOE express or implied upon which UC is relying in its decision to construct the CRT" (Lozeau Exh. N).

A few months later, however, a document from the university's Office of the President requested approval (ultimately granted) of the project's budget and design. The approval document, prepared for a May 2008 meeting of the Regents' Committee on Grounds and Buildings, indicated that roughly 95 percent of the project's funding ($107,500,000.00 of the project's $113,000,000.00 projected cost) would be paid by external financing which, in turn, would be serviced with DOE money provided via the LBNL's operating funds — which would be increased for the task. As the report explained (Lozeau Exh. C at 12–13; Def's Req. Not. Exh. 9; emphasis added):[3]

> Based on external financing of $107,500,000 amortized over 30 years at 7 percent interest, debt service would be approximately $8,660,000 annually. The source of repayment for external financing is LBNL operating funds. LBNL receives revenue from three primary sources: (1) approximately 77 percent from

---

[3] Publicly available at: http://www.universityofcalifornia.edu/regents/regmeet/may08/gb5.pdf (last visited March 9, 2009).

10

>
> the Department of Energy, (2) 8 percent from National Institute of Health (NIH) contracts and grants; and (3) 15 percent from all other agencies' contracts and grants. In fiscal year 2007, this totaled $516 million. LBNL uses all of the funds to pay for operating expenses related to lab operations and research expenditures. Revenues are expected to be expended in full each fiscal year. Within the DOE funded revenue under Contract 31, LBNL receives funds to support specific programs, such as NERSC and computational research. *DOE has been supportive of an increase in funding for these programs as needed to support the financing of this project by increasing the NERSC and CRT program funds commencing in fiscal year 2011 to be the source of repayment for the external financing.*
>
> Although Federal funds are subject to annual appropriation, the historical funding and projected funding for these programs, as well as the confidence that the University will continue to manage LBNL, provides the University with sufficient comfort to request approval for 30 year financing. If the University is replaced as the Lab manager, the current contract with DOE does not require assumption or repayment of all University debt issued for LBNL.

Tellingly, the report also stated, "[t]he general credit of the Regents shall not be pledged" (*Id.* at 3).

This document, however, was an internal *university* document. DOE has taken care to avoid any public commitment to finance the project — at least, the current record so suggests.

In response to the above-quoted university report of May 2007, Charles Marshall of DOE sent an email to the university dated May 27, 2008, expressing concern over the university's description of the project's financing plan. The email stated that Mr. Marshall "believe[d] the Regents cannot enforce [such commitments] on the DOE" and emphasized that DOE could not be held "liable" for the financing. The email also stated that "if the DOE were going to fund this building it is a federal action requiring NEPA documentation which was not done." University personnel responded and indicated that the report was an internal document which simply reflected university management's "expectation that the facility will be useful" to DOE and, if that turned out to be true, that DOE occupancy would generate funds for the university but that there was no federal financing "pledge" (Marshall Exh. 3).

Defendants further back-peddled from the May 2008 university document following the formal initiation of this lawsuit in July 2008. In November, the university submitted a "reapproval" of the project's budget to the Regents "clarif[ying] that the LBNL operating

11

1 funds were not guaranteed funds, and that their availability depend[ed] on Congressional
2 appropriations and DOE programmatic decisions" (Lozeau Exh. F at 2). The November 2008
3 "reapproval" stated that DOE continued to express "great interest" in placing its
4 supercomputers in the CRT facility but clarified that no guarantee was in place. It also offered
5 (evidently for the first time) an alternate funding scheme for the project in the event that the
6 CRT is *not* ultimately used to house DOE's supercomputers — in that case, roughly 35 percent
7 of the $8,700,000 annual financing cost would be covered by DOE and the remainder would be
8 covered by market leases and university funds.

Also in November, the university's Office of the President sent a letter to DOE's
10 Berkeley Site Office, dated the same day as the "reapproval," expressing similar sentiments.
11 The letter explained (UC Def's Req. Notice Exh. G):

> the CRT facility was originally conceived as a DOE facility.
> Indeed, DOE funded the initial programmatic and design efforts
> at the Laboratory . . . . Those efforts culminated in the
> completion of a favorable CD-0 report, which was approved by
> you and various other DOE officers . . . .
>
> However, following the completion of the CD-0 report it became
> clear that federal funding for construction of the facility would
> not become available for some years . . . . As a result, the
> University decided to build the CRT facility on its own, with no
> commitment or obligation for DOE to occupy or use the facility.

18 Defendants' actions since November 2008 are not entirely persuasive, having occurred
19 after the filing of this lawsuit when defendants had an immediate incentive to distance the
20 federal government from the project. With respect to the record before that date, is true that
21 the evidence does not indicate any funding *guarantee* or the existence of specific
22 appropriations for DOE financing. As stated, DOE has taken care to disclaim any such
23 guarantee or commitment or pledge. Moreover, with few exceptions the record details only the
24 *university's* goals or expectations regarding project's use and financing, not the federal
25 government's actual plans. Although discovery in this case is just underway, the record does
26 not establish precisely how likely it is that the federal government will be footing the bill for
27 the project, nor the degree to which DOE planning on the subject has progressed or ossified,
28 nor the extent to which it continues to consider alternate sites for its computer facilities.

12

There is substantial evidence, however, that DOE at a minimum has contemplated relocating its computer facilities to the CRT site; that the university both hoped and — at least as of the filing of this lawsuit — *expected* that it will do so; and that if DOE *does* utilize the site it will provide a substantial portion of the project's financing costs. The above-discussed evidence regarding the extent of DOE involvement in or control over the project is also bears on the likelihood that the DOE will ultimately utilize (and fund) it. As explained, the record indicates that one of the university's primary purposes for the CRT project was to house DOE's computation centers; the project has been designed with consideration of the needs of DOE computer systems; DOE had at least some important involvement with the project, had expressed support for and provided certain "preliminary approvals" for the project; and that DOE continues to express "great interest" in the project. Some record evidence also indicates that DOE's supercomputer center will soon outgrow its current site (leased facilities in Oakland) or that the current site will be inadequate for the "next-generation" computers. Considering all of this evidence, this order finds that plaintiff has identified "serious questions" as to whether or not the CRT project is a federal action. This order does not find that plaintiff has established a likelihood of success on the merits, although it is premature to predict, at this early stage, who shall prevail at trial.

**C.     Project "Proposal".**

Defendants raise one additional challenge to their obligations under NEPA: that even if the CRT project might be deemed a "major federal action," there has been no *proposal* for the action. As stated, NEPA requires an EIS for "every recommendation or report on *proposals* for legislation and other major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. 4332(2)(C) (emphasis added).  Implementing regulations define "proposal" as follows:

> Proposal exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated . . . .  A proposal may exist in fact as well as by agency declaration that one exists.

13

1  40 C.F.R. 1508.23. The regulations also specify the timing for the EIS in relation to the
2  "proposal":

> An agency shall commence preparation of an environmental
> impact statement as close as possible to the time the agency is
> developing or is presented with a proposal (§ 1508.23) . . . . The
> statement shall be prepared early enough so that it can serve
> practically as an important contribution to the decisionmaking
> process and will not be used to rationalize or justify decisions
> already made . . . .

40 C.F.R. 1502.5.

For the purposes of this motion, suffice it to say that the definition of "proposal" adds little to the analysis above. The "proposal" stage is defined not with respect to any specific, formal document or procedure but rather in a functional manner. The project's planning and development are at an advanced stage. Both sides indicated at the hearing that the will likely break ground well before the September 2009 trial in this case, although the project is not expected to be *completed*, and thus the computer centers are not expected to relocate, until 2011. If in fact construction of the project is a "federal action," then the LBNL and DOE are certainly "at that stage in the development of [the] action when [the] agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal." The time when "effects can be meaningfully evaluated" is now, not when the project is completed and DOE decides to relocate its supercomputers. Therefore, insofar as plaintiff has established substantial questions on the merits of the "federal action" issue, plaintiff has established a likelihood that there has been a "proposal" for that action.

### 2. IRREPARABLE INJURY; BALANCE OF EQUITIES AND PUBLIC INTEREST.

As explained, a preliminary injunction is appropriate where plaintiff demonstrates that "serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor." *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). Plaintiff claims both irreversible *procedural* harm as well as harm to the environment.

Plaintiff is not only likely but is virtually certain to suffer irreparable procedural injury absent an injunction if the CRT project is in fact a major federal action. There is no doubt that the failure to undertake an EIS when required to do so constitutes procedural injury to those

14

affected by the environmental impacts of a project. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 & n.7 (1992) (a typical example of procedural injury is failure to abide by "the procedural requirement for an environmental impact statement before a federal facility is constructed next door to [the plaintiff]").[4]

Defendants contend that the procedural injury is somehow ameliorated or eliminated because plaintiff had the opportunity to participate in a different *state* environmental review process. CEQA, however, is not a substitute for NEPA.

*First*, the scope and requirements of the two statutes are not in fact the same. Plaintiff emphasizes various differences between environmental reviews under NEPA and CEQA: that the requirements of each with respect to "alternatives analysis" differ; that NEPA, unlike CEQA, creates specific requirements when the agency is confronted with incomplete or unavailable information; that NEPA requires the final EIS, not just drafts, to be circulated for public review (Br. at 19–20; Reply at 13). Defendants challenge the importance of these differences and argue that CEQA "is NEPA *with teeth*." This order declines to second-guess the utility of or need for the congressionally mandated requirements by setting the two statutes side-by-side, weighing the degree of overlap and reaching an independent determination regarding the need for the federal requirements. Congress chose to require federal environmental reviews under NEPA whether or not state environmental review provisions might also govern; it did not find that NEPA was unnecessary when state laws which overlap somewhat also govern. In fact, implementing regulations address this situation and instruct *not* that NEPA review gives way to any parallel state process but rather that the federal and state agencies should cooperate in order to reduce duplication to the extent possible *while still satisfying the Act's requirements*. 40 C.F.R. 1506.2.

---

[4] Contrary to defendants' assertion, the Supreme Court's recent decision in *Summers v. Earth Island Institute* is not to the contrary. 129 S.Ct. 1142 (2009). In *Summers*, the plaintiffs had challenged the Forest Service's failure to apply two regulations to a forestry project and also challenged six other regulations. The dispute regarding the forestry project itself settled. The decision held that, with the concrete project no longer at issue, the plaintiffs lacked standing to challenge the regulations because "procedural right without some concrete interest that is affected by the deprivation — a procedural right *in vacuo* — is insufficient to create Article III standing." *Id.* at 1151, 1153. Here, there is a live dispute regarding the CRT project and defendants do not argue that plaintiff lacks a concrete interest in the case.

15

*Second*, the argument misses a significant purpose of NEPA. CEQA is aimed at *state* decision-makers; NEPA, including its EIS provisions, aims to ensure that the *federal government* will "have available, and [] carefully consider" the information that Congress wished for it to consider in order appropriately to plan and coordinate federal policy. There is no reason to assume that state laws requiring a state agency to conduct an environmental review serves this purpose. In this regard defendants seek to have it both ways. When arguing that the project is not a federal project, defendants cast the federal government as detached, ambivalent, largely uninvolved observers. When discussing the balance of equities and the harm plaintiff may suffer, however, defendants conflate the federal and state governments. Defendants list various changes that were made to the project as a result of the CEQA process and argue that "CEQA succeeded in preventing the very harm NEPA would have attempted to prevent" and that (Opp. at 18, 22):

> Viewed realistically, the injury invoked by plaintiff is merely the denial of a third bite at the environmental-review "apple." Plaintiff would likely obtain nothing more from a third bite under NEPA than it obtained from its first two under CEQA, inasmuch as NEPA could not compel DOE to further mitigate or avoid any remaining adverse environmental consequences.

As explained, NEPA's stated purpose is not to "compel" any specific mitigation measures but rather to compel procedures that, *inter alia*, feed specified information into the *federal* policy process, steps Congress calculated will achieve certain goals including environmental goals. A state process in which the federal government played little part is no substitute. If on the other hand defendants' point is that the federal government actually *has* been significantly involved in planning and coordinating the project, the fact would cast doubt on the merits of defendants "major federal action" arguments. In all respects, Congress made no finding that the state laws suffice in this circumstance. There is no doubt that the alleged breach of NEPA constitutes procedural injury.

It is also quite possible that plaintiff will suffer environmental injury. It is true that NEPA does not mandate any specific environmental outcome. *See Winter*, 129 S.Ct. at 376 ("NEPA itself does not mandate particular results . . . . Instead, NEPA imposes only procedural requirements to ensur[e] that the agency, in reaching its decision, will have

16

available, and will carefully consider, detailed information concerning significant environmental impacts") (quotations and citations omitted). It would be incorrect, however, to conclude that the Act was designed to serve no substantive policy goals or to remedy no substantive harms. Rather,

> The purposes of [the Act] are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation . . . .

42 U.S.C. 4321. *See also* 42 U.S.C. 4331. Courts generally presume that acts of Congress tend to achieve the goals they were designed to achieve. Moreover, this case is unlike *Winter*, where the federal government had been engaged in the precise conduct at issue for decades and had already taken a "hard look" at the environmental consequences thereof. *Winter*, 129 S.Ct. at 376. Here, defendants themselves argue that the federal government has been largely uninvolved and instead ask the Court to undertake a counterfactual: that the federal government would have undertaken the same analysis as the university and would have reached the same conclusions regarding mitigation and/or alternatives. The record provides little basis, however, for such a leap. In any event, the "likelihood of injury" requirement is satisfied by the above-discussed procedural injury.

There is also no doubt, moreover, that injury from the alleged violation is both imminent and irreparable. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Production Co.*, 480 U.S. at 545. The procedural injury is also irreparable — even if a NEPA review might later be conducted. Implementing regulations specify when NEPA review must be conducted and limit the agency's ability to proceed with major federal actions absent the proper procedures beyond specified stages, *inter alia*, to a stage where the project would "[h]ave an adverse environmental impact" or would "[l]imit the choice of reasonable alternatives." 40 C.F.R. 1506.1. Thus, plaintiff will have been deprived of the opportunity to participate in NEPA process at a time when such participation is required

17

1   and is calculated to matter. The injury is also imminent. At the hearing, the parties indicated

2   that the project will soon break ground, including clearing out acres of trees and conducting

3   grading activities to prepare the site. Trial in this case is scheduled for September 2009,

4   already an accelerated schedule which, the parties indicate, cannot be further advanced. Even

5   if plaintiff ultimately wins, much of the environmental harm will already have occurred and

6   alternatives will have been foreclosed. In sum, absent an injunction, plaintiff is highly likely

7   imminently to suffer irreparable injury from the alleged NEPA breach.

8   Both sides argue that the balance of equities and the public interest weigh in their favor.

9   This order finds that the balance of equities tips sharply in plaintiff's favor. As explained,

10  plaintiff's alleged injury is imminent and irreparable. Defendants, in turn, argue that NEPA

11  review would delay construction of the CRT project by some twelve months. That delay, they

12  argue, would cause "scientific harm" because the facility is intended to support the research

13  and academic programs of the LBNL and the university. The UC defendants, however,

14  identify no specific scientific harm to university efforts nor scientific projects which would be

15  flummoxed by a delay until trial, and instead merely assert "scientific harm" generally. The

16  federal defendants, for their part, have taken no position on such issues, and in all respects the

17  crux of defendants' arguments has been that the federal government in fact has no imminent

18  need for the facility nor concrete plans to use it. The UC defendants also point to economic

19  injury: they estimate that the delay would result in increased construction and related expenses

20  of $7,300,000. The estimates, detailed only in one short paragraph of the declaration of Henry

21  Martinez, are entirely conclusory and unexplained — and appear somewhat implausible.[5]

22  Finally, the public interest favors the entry of a temporary, limited injunction. The

23  alleged NEPA violation and the possibility of resulting environmental harm certainly adversely

24  affect the public interest. The delay, in contrast, will cause little or no clear injury to the

---

[5] The bulk of the estimate derives from "significant escalation costs," estimated at five percent for the one-year period for a total cost of $4,200,000 (Martinez Decl. ¶ 3). It is difficult to understand or credit the claim without further explanation at a time when inflation is very low and the construction industry is, to say the least, hardly booming. In this regard, this order takes judicial notice of the following two public documents published by federal government entities: http://www.philadelphiafed.org/research-and-data/real-time-center/survey-of-professional-forecasters; http://www.frbsf.org/publications/economics/fedviews/index.html (Mar. 11, 2009). Similarly, the bases for and assumptions underlying the estimate that "loan interest expense" will add "approximately $2,500,000 to the project cost with a twelve month delay" are entirely unexplained.

1  public.  To reiterate, both sets of defendants argued that the federal government, for its part,
2  had no imminent need for the facility and no concrete plans to use it.  The university may have
3  an interest in proceeding with the facility in order to retain the LBNL contract, but this order
4  finds no reason to conflate the university's interest in that regard (as opposed to the same
5  interest of other potential candidates for the contract) the with the public interest.

6  For all of these reasons, this order finds the entry of a limited preliminary injunction
7  warranted.  The injunction, however, will be no greater than necessary to avoid irreparable
8  harm to plaintiff.  This order enjoins defendants from entering any contract or undertaking any
9  action, without prior approval of the Court, that will disturb the land itself pending a
10 determination of the merits.  The project itself, however, is not otherwise enjoined.  Planning
11 contracts may be made so long as no land will be disturbed.

*     *     *

13 The UC defendants argue that, if an injunction issues, plaintiff should be required to
14 give security.  Although Rule 65(c) generally requires the movant to give security, "[t]he court
15 has discretion to dispense with the security requirement, or to request mere nominal security,
16 where requiring security would effectively deny access to judicial review."  *People of State of*
17 *Cal. ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.
18 1985).  This is a case where the proposed bond requirement would effectively deny access to
19 judicial review.  Plaintiff is a small non-profit organization and has indicated that it would
20 have difficulty posting the bond.

19

**CONCLUSION**

For all of the above-stated reasons, plaintiff's motion for a preliminary injunction is **GRANTED**.[6]

**IT IS SO ORDERED.**

Dated: March 18, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[6] Defendants also move to strike the declarations in support of plaintiff's motion. To the extent that the declarations were not relied upon herein, the motion is moot. The bulk of the documents this order did rely upon — including the draft and final CEQA environmental impact reports and the LBNL contract — are included in defendants' own request for judicial notice and/or are publicly available on government or university websites. Plaintiff would certainly have personal knowledge of certain other documents, such as the January 2008 letter plaintiff sent in the course of the CEQA review process. For other documents, however, this order has considered defendants' objections when determining the degree of weight to afford the evidence. Finally, defendants also filed two motions to dismiss (Dkt. Nos. 18, 45). After a First Amended Complaint was filed, plaintiff responded with a statement of non-opposition to the motions and suggestion of mootness (Dkt. No. 74). The motions to dismiss are granted as unopposed and moot.