IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAVE STRAWBERRY CANYON,

    Plaintiff,

  v.

DEPARTMENT OF ENERGY, a federal agency, *et al.*,

    Defendants.

No. C 08-03494 WHA

**ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff Save Strawberry Canyon brought this action under the National Environmental Policy Act to challenge a large development project planned by the Lawrence Berkeley National Laboratory and the University of California. The complaint seeks to halt the project until defendants comply with NEPA. A March 2009 order granted injunctive relief pending a determination on the merits. Both sides now move for summary judgment. For the reasons stated below, plaintiff's motion is **GRANTED** and defendants' motions are **DENIED**.

## STATEMENT

The Lawrence Berkeley National Laboratory is one of ten national laboratories overseen by the United States Department of Energy's Office of Science. LBNL and DOE's other national laboratories are an important part of our national research program, "crown jewels of our national research infrastructure."[1] LBNL grew out of the work of Nobel Prize-winning

---

[1] "U.S. Department of Energy's Office of Science: Steward of 10 World-Class National Laboratories," at 1 (October 2008), *available at* http://www.lbl.gov/DIR/Institutional-Plan/. Pursuant to Rule 201, this order takes judicial notice of this public government document, Exhibit C to the UC defendants' request for judicial notice and the following federal-government website: http://www.lbl.gov/LBL-PID/LBL-Overview.html.

physicist Ernest O. Lawrence at the University of California in the 1930s and has been a federal facility since 1942. It has grown far beyond Dr. Lawrence's research in particle-based physics and today is charged with conducting unclassified research for DOE across a wide range of disciplines including advanced materials, life sciences, energy efficiency and detectors and accelerators. The laboratory is located on a 200-acre site in the hills above the University of California campus (Lozeau Exh. 1).

Since 1942, the laboratory has been continually managed and operated for DOE by the University of California under a series of "management and operating contracts." As the current contract states, the University of California "shall . . . accomplish the missions and programs assigned by the U.S. Department of Energy and manage and operate the Laboratory" (*Ibid*.). The contract is governed by the Federal Acquisition Regulations and the Department of Energy Acquisition Regulations.

DOE renewed its contract with the university most recently on April 19, 2005. The contract competition formally began in December 2004, when DOE issued a request for proposals to manage the laboratory. This was the first time that DOE had ever held an open competition for the contract. The university's continuing status was uncertain even before the request for proposals issued: it had been operating the laboratory on a series of one-year contracts since 2002 while DOE developed its plans for the contract competition. The new 2005 contract granted the university management of the laboratory for a fixed term of five years, with the possibility for phased extensions up to twenty years if the university meets DOE's performance criteria (Nelson Decl. ¶¶ 3–5). Although the university won the competition, there were plainly some aspects of the relationship that DOE wanted to improve, as discussed in greater detail below.[2]

LBNL operates under an annual budget provided by the federal government (predominantly DOE, along with other federal agencies). Over the years, the university has

---

[2] This order takes judicial notice of the following government websites and publicly-available University of California press release: http://www.energy.gov/news/1616.htm; http://www.universityofcalifornia.edu/news/article/6076.

2

received billions of dollars in federal funding to house and operate the laboratory. In 2008, the laboratory's budget was approximately $600 million.

This lawsuit concerns a proposed new building for the national laboratory to be built near Strawberry Canyon. The Computational Research and Theory project ("CRT") is a development project for the construction of a large new building at LBNL along with access driveways and other infrastructure. The CRT facility is being built to house the Department of Energy's National Energy Research Scientific Computing Center ("NERSC") and associated computer systems. It will also house researchers from LBNL and the university. Planning has been underway at least since 2004. The CRT building will be approximately 126,300 square feet in size and will be located in the western portion of the LBNL complex adjacent to Building 50, off of Cyclotron Road in Berkeley, again near Strawberry Canyon. The facilities will be owned by the university and will be constructed on university-owned land within LBNL (Banda Exh. A; Yelick Decl. ¶¶ 3–5; Lozeau Exhs. 4–6).

Although the CRT facility will be a multi-use facility, it is being built predominantly to provide a new home to the DOE's NERSC supercomputing program. NERSC is the flagship scientific computing facility for the DOE's Office of Science. It is one of the largest facilities in the world devoted to providing computational resources and expertise for basic scientific research. It supports disciplines ranging from climate modeling, research into new materials, simulations of the early universe, analysis of data from high energy physics experiments, investigations of protein structure, among other scientific endeavors. NERSC is operated by LBNL under DOE's contract with the university. Currently, the NERSC supercomputers are located in the Oakland Scientific Facility, a facility leased by UC Berkeley. At any given time, LBNL operates two supercomputing systems and upgrades those facilities on staggered schedules. LBNL has commenced the procurement process for the next system, "NERSC 6" (Banda Exh. A; Yelick Decl. ¶¶ 8–14).[3]

Plaintiff Save Strawberry Canyon is a local citizens' group based in Berkeley. Its mission is to preserve and protect the watershed lands and cultural landscape of Strawberry

---

[3] This order takes judicial notice of the following federal website: http://www.nersc.gov/about/.

3

Canyon, which is located in the hills adjacent to LBNL and the Berkeley campus. In this action, plaintiff claims that the CRT project would damage the environment in or around Strawberry Canyon and would harm its members' recreational and aesthetic enjoyment of the area. Plaintiff seeks a declaration that the CRT project is a "federal action" governed by the National Environmental Policy Act and injunctive relief halting the development and construction of the project until NEPA compliance is achieved. Defendants include the Department of Energy; the Secretary of Energy; the interim director of the Lawrence Berkeley National Laboratory; and each of the members of the Regents of the University of California.

Defendants have taken no steps to comply with NEPA because, they maintain, NEPA does not apply, supposedly because this is a state project and not a federal project. Defendants have been on notice, however, at least since January 2008 of plaintiff's contention that the project is governed by NEPA. Plaintiff sent a letter to LBNL's Environmental Planning Group Coordinator dated January 4, 2008, expressing the view that the project is a federal action and therefore is subject to NEPA. LBNL responded to plaintiff's letter and stated that the project "is not subject to NEPA review." LBNL and the university did, however, prepare an environmental impact report pursuant to the California Environmental Quality Act which, plaintiff alleges, is less demanding. Cal. Pub. Resources Code §§ 21000 *et seq*.

Plaintiff commenced this action in July 2008. A preliminary injunction issued in March 2009 barring any action on the CRT project that would disturb the land pending a determination on the merits of plaintiff's claim that the project is a "major federal action" subject to NEPA. The project itself, including planning contracts, however, was not otherwise enjoined (Dkt. No. 104). Both sides now move for summary judgment.

**ANALYSIS**

NEPA requires federal agencies to include an environmental impact statement ("EIS") in "every recommendation or report on *proposals* for legislation and other *major Federal actions* significantly affecting the quality of the human environment." 42 U.S.C. 4332(2)(C) (emphasis added). When agencies do not know whether the effects of an action will be

"significant" they are directed to prepare a shorter environmental assessment ("EA") to help make that determination. 40 C.F.R. 1501.4(b).

By its own terms, Section 4332(2)(C) is triggered by "proposals" for "major *federal* actions" — that is, "[t]o trigger the application of NEPA, an action must be 'federal.'" *Rattlesnake Coalition v. Environmental Protection Agency*, 509 F.3d 1095, 1101 (9th Cir. 2007). The term "major federal actions" is defined by regulation. 40 C.F.R. 1508.18. Regulations also define when an action reaches the "proposal" stage. 40 C.F.R. 1508.23.

"There can be major federal action when the primary actors are not federal agencies, but rather state or local governments, or private parties." *State of Alaska v. Andrus*, 591 F.2d 537, (9th Cir. 1979). That is, extensive federal involvement can "federalize" an otherwise state or local project under NEPA. "There are no clear standards for defining the point at which federal participation transforms a state or local project into a major federal action." *Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 960 (9th Cir. 2002) (citations omitted). Instead,

> The matter is simply one of degree. "Marginal" federal action will not render otherwise local action federal. To make this determination, we look to the nature of the federal funds used and the extent of federal involvement.

*Ibid*.

This is a case for which existing authority presents no precise analogy. Most decisions on the subject involved projects that were more clearly "local" than this one — projects initiated by a locality for the benefit of the locality — and for which the federal role was more limited and more clearly defined. For example, *Rattlesnake Coalition* addressed a local plan for making improvements to the wastewater treatment and collection system for the City of Missoula. Similarly, *Ka Makani* involved a plan by the Hawaii Department of Water Supply for a "transbasin water diversion system" to provide potable water for coastal resorts on Hawaii's Big Island. The issue confronted by these decisions was whether limited federal financing or a limited federal advisory role were sufficient to federalize the project. The decisions found that they were not.

5

Here, in contrast, the project is far more closely intertwined with the federal agency and in more complex ways. As explained below, the genesis of the project is DOE and its federal contract governing LBNL. The federal contract required the university to operate and manage the NERSC supercomputing program and, crucially, it further required that (Lozeau Exh. 1 at C-4; emphasis added):

> [the university], in partnership with DOE, *shall*:
>
> \* \* \*
> Renew and enhance research facilities and equipment so that the Laboratory remains at the state-of-the-art over time and is well-positioned to meet future DOE needs.

LBNL and the university devised the CRT project in response to DOE concerns about inadequate infrastructure at laboratories: the NERSC supercomputer program was projected to run out of space at its current facility. The DOE's supercomputers needed a new home, and the CRT project was launched to provide that new home. In other words, the university undertook the project in large part *for* the federal government pursuant to a federal contract that *obligated* the university to provide upgraded facilities like the CRT. Once the planning was underway, the federal agency provided key input to shape the project and retained oversight mechanisms to ensure that its objectives were met.

It is also true, however, that the federal contract did not mandate or specify the details of the facility. The university retained some flexibility regarding how precisely to satisfy the federal agency's objectives and managed the day-to-day planning, design and construction. The federal agency has yet to commit in writing to use the facility for the NERSC program (and will not do so until after the project is built), although the record leaves little doubt that it is highly likely to use the facility. To date, no federal funds have been earmarked for this project and the federal government has undertaken no firm commitment to finance the project, although the university receives hundreds of millions of dollars in federal funding annually to manage LBNL and additional federal funds are expected to cover the vast majority of the project's costs.

This is a novel fact pattern for which no on-point precedent has been found. Although decisions such as *Rattlesnake Coalition* and *Ka Makani* presented for review the relevance under NEPA of limited federal financing or a limited federal advisory role, the term "actions" in

the dispositive phrase "major federal actions" encompasses a range of factors: "[a]ctions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies . . . ." 40 C.F.R. 1508.18(a). The regulations provide illustrative categories of "actions," including the following: "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities." *Id*. at 1508.18(b)(4).

The touchstone of NEPA, ultimately, is the extent to which federal decision-makers are or were in a position to weigh alternatives and influence environmental outcomes. This is because "[t]he purpose of NEPA is to bring environmental considerations to the attention of federal decision-makers. This pre-supposes that [the federal agency] has judgment to exercise." *Ka Makani*, 295 F.3d at 960–61. *See also* 40 C.F.R. 1500.1(c).

DOE is a federal agency. LBNL is a federal project. The management and operating contract is a federal contract. The federal contract requires upgrades like the CRT. The CRT is being built with the expectation that it will fulfill this federal requirement. But for the DOE and its national labs project, it is highly doubtful that this facility would have been proposed. Without question the DOE and its national labs project have been a substantial factor in bringing the CRT project to the proposal stage. Without question, DOE has provoked and shaped the project. Without question, there have been decision points at which the federal agency could have weighed the environmental impact of the project.

In short, this order concludes that federal decision-makers *were* in a position to, and did, exercise discretion over the project in ways that rendered NEPA applicable, based on the findings that now follow.

**1.  DOE OBLIGATED THE UNIVERSITY TO PROVIDE FACILITIES LIKE THE CRT**.

The federal contract provided that LBNL and its contractor "shall conduct computational research including the management and operation of the [NERSC] Center" (Lozeau Exh. 1 at C-10). As stated, it also specifically *required* the university to upgrade

LBNL facilities for programs like the NERSC supercomputer program on an ongoing basis (Lozeau Exh. 1 at C-4; emphasis added):

> in partnership with DOE, *shall*:
>
> \* \* \*
>
> Renew and enhance research facilities and equipment so that the Laboratory remains at the state-of-the-art over time and is well-positioned to meet future DOE needs.

In other words, DOE entered a contract that specifically *required* the university to not only operate the NERSC supercomputers but to provide and "enhance" "state-of-the-art" facilities for DOE over time. Indeed, the federal contract required the university to do so irrespective of any firm commitment by the federal government to use the facilities.

### 2. DOE SPECIFICALLY TOLD THE UNIVERSITY THAT IT NEEDED A CRT FACILITY FOR RELOCATION OF THE NERSC PROGRAM.

By 2004, DOE recognized that the Oakland facilities housing the NERSC program were insufficient. The program was projected shortly to outgrow the facility. DOE left no doubt about its need for new facilities, and it indicated that the CRT facility would satisfy those needs.

In October 2004, LBNL prepared a "Project Charter" for the CRT project. It stated that the university's infrastructure "to house supercomputing facilities" was inadequate and explained that "the Department of Energy has asked that contractors provide a cost effective mechanism for financing to address inadequate infrastructure at laboratories" and "would like to relocate [NERSC] back to the Berkeley Lab site." The "project scope" included "secure the Mission Need Approval by DOE" and "completion in CY 2008, for a scheduled installation of a planned major upgrade of NERSC computing capacity . . . ." (Lozeau Exh. 69). One month later, LBNL's Ten-Year Site Plan reiterated that the Oakland space would soon be full and that NERSC needed additional floor space to meet DOE's needs. It also explained that NERSC had to move to the main LBNL site to fully meet DOE security requirements.[4]

DOE's looming first-ever open competition for the federal contract added greater urgency to the obligation already imposed on the university by the contract. As stated, DOE

---

[4] Ten-Year Site Plan at 45 (Nov. 1, 2004). This order takes judicial of the November 2004 Ten-Year Site Plan, which is available at the following government website: http://rfplbnl.sc.doe.gov/html/lbnl_institutional.html.

8

invited proposals for the new federal contract in December 2004. The university submitted its proposal in February 2005. Its proposal specifically noted that its "vision" for LBNL included "invest in new scientific facilities to address DOE mission needs," with "scientific computing" being among the priorities (Lozeau Exh 105 at 2). With the university acting to address DOE's needs, DOE awarded it the renewed contract in April 2005.

In October 2005, DOE provided the anticipated "mission need" approval for the CRT project (called a "CD-0" approval). Therein DOE confirmed that, in its view, the NERSC supercomputers *did* require new facilities and DOE granted a preliminary approval (albeit non-binding) of the CRT project as a solution. The mission need identified "NERSC's upgrade as a near-term priority" and predicted a "shortfall of available computational resources for [DOE's] mission by as much as a factor of 8 in 2008" (Lozeau Exh. 21).

As stated, in the federal contract DOE had required the university to head off any such shortfall without regard to any formal DOE commitment. The "mission need," however, certainly provided a reassuring statement of support for the project. With DOE's approval, the project moved forward to provide a new home for the NERSC program.

### 3. DOE MAINTAINED OVERSIGHT.

Under the management and operating contract, DOE achieved its objectives for the LBNL not through specific, detailed directives but rather through general mandates which, in turn, DOE enforced through performance-based contracting. The contract explained (and still explains) that it (Lozeau Exh. 1 at C-1; emphasis added):

> reflects the application of performance-based contracting approaches and techniques which emphasize results/outcomes and minimize "how to" performance descriptions. The Contractor [*i.e.*, the university] has the *responsibility* for total performance under the contract, including determining the specific methods for accomplishing the work effort, performing quality control, and assuming accountability for accomplishing the work under the contract

That the university was given some flexibility under the contract to determine the specific *methods* for achieving DOE's goals does not diminish its "responsibility" for achieving those goals. Furthermore, consistent with this performance-based approach, the federal contract granted DOE specific means to enforce its objectives for the contract on an ongoing basis. The

9

contract detailed a "Performance Evaluation and Measurement Plan" that "identifies performance outcomes and indicators" to evaluate the extent to which the university discharged its responsibilities under the contract (Lozeau Exh. 1 at C-2).

DOE specifically targeted the CRT project as a DOE priority in those performance evaluations. For example, 2007 was evaluated as a "banner year" for the criteria "effectiveness of supporting the construction of new laboratory facilities through alternative financing" because of the university's progress with the CRT project and one other new facility. In fact, the evaluation belied defendants' claim that DOE has undertaken no planning to relocate the NERSC supercomputers to the new CRT facility. The 2007 evaluation — prepared by DOE — stated that "[t]he CRT facility *will house* the NERSC . . . which *will be relocated back* to the LBNL from a leased facility in downtown Oakland" (Lozeau Exh. 97 at 24; emphasis added). DOE's 2005 and 2006 performance evaluations also addressed and graded the university's progress with the CRT project (Lozeau Exhs. 99, 101). The performance evaluations, no doubt, provided DOE a powerful tool to guide the project and ensure that the federal objectives were being met.

### 4. DOE PROVIDED KEY INPUT.

DOE exercised its discretion over the CRT project in other respects. The federal contract identified specific individuals as "key personnel" who were "considered essential to the work being performed under [the] contract." Although these LBNL "key personnel" were employees of the *university* — LBNL was not an independent agency or entity with employees of its own — the *federal government* paid their salaries via the LBNL budget, and the federal contract granted DOE some control over decisions to remove or transfer them. No doubt, the jobs of LBNL's "key personnel" included advancing the federal government's objectives under the contract and the federal government retained a degree of control and influence over them. As the DOE's 2005 performance evaluation explained, "LBNL leadership continued to communicate and work closely with [DOE] to align the Laboratory's scientific and operational activities with DOE scientific and management priorities." These "key personnel" included Dr. Steven Chu, the Laboratory Director, and Dr. Horst Simon, the Associate Laboratory Director

10

for Computing Sciences, among several others. Dr. Katherine Yelick took over Dr. Simon's position in early 2008 (Lozeau Exhs. 3, 22, 23, 64, 101; 2nd Richards Decl. ¶ 3).[5]

These LBNL key personnel exercised important decision-making roles for the CRT project. Key personnel decided on or approved the location of the CRT facility and fundamental construction parameters. For example, Dr. Simon made decisions regarding the overall size of the project and the building's shape — a "coaxial" or long and skinny shape. Drs. Chu and Simon determined the power needs and set the maximum power capacity of the facility. The facility's location was chosen in part because, as the state EIR explained, "[l]ocating the computer equipment at the main Hill campus is also a security requirement of the Department of Energy, which would provide funding for some of the CRT programs" (Lozeau Exh. 7, 23, 59, 76–78).

Dr. Chu also effectively exercised veto power over the project's budget. Dr. Chu explained in his deposition that, although he did not have "final authority" over the budget, he did "have authority about what the laboratory [would] propose" to the university. In other words, the budget had to go through Dr. Chu. Emails among LBNL staff confirm that Dr. Chu did in fact exercise that authority. He initially "was adamant" that the budget be no greater than $90 million, and fellow staff understood that he would "just reject . . . outright" any budget above $90 million absent strong justification. The budget initially proposed to, and approved by, the university was $90 million. Later, when a larger budget became necessary, Dr. Chu "grudgingly approved the $112.9 million total project budget." Sure enough, in May 2008 a $113 million budget was proposed to and approved by the university (Lozeau Exhs. 23, 70–72).

With LBNL leadership "work[ing] closely with [DOE] to align the Laboratory's scientific and operational activities with DOE scientific and management priorities," these

---

[5] Defendants object to Exhibit 22 of the Lozeau Declaration, deposition testimony of Dr. Katherine Yelick, on the grounds that plaintiff established no foundation that Dr. Yelick has personal knowledge about the sources of funds used to pay for tasks performed by LBNL's "key personnel." The objection is overruled. Defendants conceded at the hearing that the salaries of LBNL's "key personnel" derive from LBNL's operating budget. Dr. Yelick further testified in her deposition that her salary was not reimbursed by the university, reasoning that she does not keep timesheets so there could be no attribution of time to any particular source. She has personal knowledge that she does not keep timesheets; it is a reasonable inference that her time is therefore not attributed between the LBNL and university budgets. Dr. Chu offered similar testimony.

11

important decisions by LBNL's director and other "key personnel" must be understood to have aligned the project with DOE's needs and advanced DOE's mission.

### 5. DOE WILL PROVIDE CHEAP FEDERAL POWER.

The project also will rely on cheap federal energy. The project proposes to derive its power from the Western Area Power Administration, a federal source of power under the control of DOE. WAPA power is less expensive than power from the local utility. Granted, as defendants emphasize, other sources of power were (and are) theoretically possible, but the project proposed *only* to use WAPA power; no other source of power was planned. LBNL personnel, including Dr. Chu, made the decision to rely exclusively on WAPA power. They must have done so with the approval (whether tacit or explicit) of DOE: the university alone did not have authority to access WAPA power absent federal approval (Lozeau Exhs. 7, 9, 15, 23, 45). Such discounted federal power will amount to federal funding for the project and further evidences the participation of the federal government.

### 6. OTHER FEDERAL FINANCING.

As explained, decisions regarding the alleged "federalization" of an otherwise state or local project for NEPA purposes have also focused on the proportion of federal versus local funding for the project. *See, e.g.*, *Ka Makani*, 295 F.3d at 960–61. To date, zero or *de minimus* federal funds have been provided. Furthermore, the federal government has yet to provide any firm commitment that it will finance the project in the future. Hundreds of millions of federal dollars, however, flow to the university annually for the operation of LBNL and the record presents an unambiguous understanding that the federal government will ultimately provide further funding specifically to cover the CRT project's costs.

The March 2009 preliminary injunction discussed the nature of federal funding in depth. In brief, according to the budget approved by the university regents, the vast majority of the project's construction costs — approximately 95 percent — will be funded initially via debt financing borrowed by the university. Then, if and when DOE and the LBNL relocate the NERSC supercomputers to the facility, the federal government will cover the debt financing costs through federal LBNL funds. LBNL's operating budget is projected to increase for the

task. That is, under the budget approved by the university, the federal government will ultimately pay for not only *use* of the facility but also for the *construction* — it will provide funds to repay the debt used to finance the construction.[6]

Emails among LBNL personnel confirm that LBNL personnel received back-channel assurances from DOE that the expected federal financing would be forthcoming. In fact, DOE affirmed these assurances publicly, if opaquely. In May 2008, *eight days before the project's budget was submitted to the university regents for approval* (a budget under which the university would borrow more than $100 million based on the expectation of future DOE funding to cover the borrowing costs) DOE provided a letter to LBNL's Director expressing general support for the project. Nevertheless, it is true that there has been no direct federal funding for the project to date and there is no binding federal commitment (Griffiths Exhs. D, G; Lozeau Exhs. 5, 8, 103, 106–107, 109–110).[7]

Under Ninth Circuit law, the mere speculation about future federal funding is insufficient, arguably even when the federal funding is likely. *See Rattlesnake Coalition*, 509 F.3d at 1101–02, 1104 (quoting *Citizens Alert Regarding the Env. v. EPA*, 259 F. Supp. 2d 9, 20 (D.D.C. 2003)). It is unclear if this concept would extend to a situation where, as here, the project is undertaken pursuant to a contract by which hundreds of millions of dollars in federal funding are provided annually (albeit not specifically for the project here at issue), and the project is undertaken based on the clear understanding that additional financing will be forthcoming specifically for the project. This order need not and does not base its conclusions on future federal funding, however, because it concludes that the above-described federal involvement in the project amounts to a "major federal action." Nevertheless, the funding plans

---

[6] In November 2008, after the filing of this lawsuit and after the project was well underway, LBNL submitted a "reapproval" of the budget to the university regents that presented (for the first time) an alternate financing scenario in the event that "NERSC somehow does not occupy the CRT." Under that scenario, LBNL's operating budget would cover approximately 35 percent of the project's construction costs, with the remainder to come from leasing the facility and other sources (Lozeau Exh. 8).

[7] Defendants object to Exhibits 106, 107, 109 and 110, which are all emails, on hearsay grounds. These emails are admissible to prove up the communications themselves (as opposed to the truth of the representations), the only purpose for which they are considered herein.

13

for the project certainly further illuminate the extent of the federal-state interaction on this project.

### 7. SUMMARY.

The record presents no genuine issues of material fact. All parties have so agreed. This order concludes as a matter of law that the totality of DOE's involvement in construction of the CRT project constituted a "major federal action." There is no real dispute that a primary purpose of the CRT project from its inception was to house federal NERSC supercomputers. Defendants do not argue to the contrary. Instead, defendants attempt to separate construction of the facility from a final future decision by the federal government to use the facility for the NERSC program. They argue that *construction* of the CRT project was driven by the *university* alone, not DOE, in an effort to remain competitive for federal funding and to retain its status as the LBNL contractor. Defendants emphasize that the university at all times remained free to construct the project without any federal approval and that the federal government has undertaken no firm commitment either to use or finance the facility. Under defendants' view, DOE simply sat on the sidelines as the university — of its own volition and without any federal control — took the initiative on its own to construct a potential home for the NERSC supercomputers in order to make itself an attractive partner for the federal government in the future.

Defendants' view is rejected. DOE entered a federal contract with the university that *obligated* the university to provide and upgrade "state-of-the-art" facilities for the NERSC supercomputers. DOE stated unambiguously that, in its view, NERSC's existing facilities were inadequate and new facilities were needed. The federal contract required the university to position itself to meet DOE's objectives for LBNL (including the NERSC supercomputer program) by providing adequate facilities *whether or not* DOE provided any commitments or ultimately elected to utilize the facility. Once the project was underway, DOE monitored the project and graded the extent to which it met the federal government's objectives via the LBNL performance evaluations. LBNL "key personnel" made important decisions for the project. Furthermore, the record belies defendants' claim that DOE does not plan to use the facility. As

14

stated, a DOE performance evaluation stated that the new facility "will house" the NERSC program. Similarly, LBNL's long-term planning documents, which were prepared by LBNL personnel but were approved by DOE, confirmed the same (Lozeau Exhs. 94–95).

NEPA regulations direct that the federal agency has proposed a federal action when a federal agency "has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal." 40 C.F.R. 1508.23. This time has been reached. The record leaves no doubt that the federal government has a goal — a new home for the NERSC supercomputing program — and has actively *prepared* to make a decision on means of accomplishing that goal (even if no final, binding decision has been reached). In fact, the record demonstrates no consideration of alternative sites *other than* the CRT facility. For all of these reasons, construction of the CRT project is subject to NEPA.

## CONCLUSION

For all of the above-stated reasons, plaintiff's motion for summary judgment is **GRANTED** and defendants' motions for summary judgment are **DENIED**. The CRT project, including the *construction* of the CRT facility at LBNL, is subject to NEPA. Construction of the CRT project will remain enjoined until proper NEPA review is completed by the Department of Energy. This order only holds that NEPA applies. Whether an environmental assessment only versus a full-scale environmental impact statement must be completed must, in the first instance, be a decision for the agency.[8]

**IT IS SO ORDERED.**

Dated: August 17, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[8] Apart from those previously addressed herein, all objections to evidence and requests for judicial notice are denied as moot.

15